IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
SOUTHWESTERN DIVISION

| | | |
|---|---|---|
| ROBERT TRENT FORMAN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 13-05080-CV-SW-REL-SSA |
| | ) | |
| CAROLLYN W. COLVIN, | ) | |
| Acting Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

### ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Plaintiff seeks review of the final decision of the Commissioner of Social Security denying his application for disability insurance benefits under Title II of the Social Security Act ("the Act"), 42 U.S.C. § 401, et seq. Plaintiff argues that the Administrative Law Judge ("ALJ") erred in giving reduced weight to Dr. Christopher Andrew's standing and walking limitations in making the residual functional capacity determination. I find that the ALJ's opinion is supported by substantial evidence. Plaintiff's motion for summary judgment will, therefore, be denied and the decision of the Commissioner will be affirmed.

### *I. BACKGROUND*

On May 21, 2010, Plaintiff applied for a period of disability and disability insurance benefits alleging that he had been disabled since January 22, 2010. Plaintiff's application was denied initially. On February 27, 2012, a hearing was held with an ALJ. On June 7, 2012, the ALJ found that Plaintiff was not under a "disability" as defined in the Act. On April 17, 2013, the Appeals Council denied Plaintiff's request for review. Therefore, the decision of the ALJ stands as the final decision of the Commissioner.

## II. STANDARD FOR JUDICIAL REVIEW

Section 205(g) of the Act, 42 U.S.C. § 405(g), provides for judicial review of a "final decision" of the Commissioner under Title II. The standard for judicial review by the federal district court is whether the decision of the Commissioner was supported by substantial evidence. 42 U.S.C. § 405(g); Richardson v. Perales, 402 U.S. 389, 401 (1971); Johnson v. Chater, 108 F.3d 178, 179 (8th Cir. 1997); Andler v. Chater, 100 F.3d 1389, 1392 (8th Cir. 1996). The determination of whether the Commissioner's decision is supported by substantial evidence requires review of the entire record, considering the evidence in support of and in opposition to the Commissioner's decision. Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951); Thomas v. Sullivan, 876 F.2d 666, 669 (8th Cir. 1989). "The Court must also take into consideration the weight of the evidence in the record and apply a balancing test to evidence which is contradictory." Gavin v. Heckler, 811 F.2d 1195, 1199 (8th Cir. 1987) (citing Steadman v. Sec. & Exch. Comm'n, 450 U.S. 91, 99 (1981)).

Substantial evidence means "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson, 402 U.S. at 401; Jernigan v. Sullivan, 948 F.2d 1070, 1073 n.5 (8th Cir. 1991). However, the substantial evidence standard presupposes a zone of choice within which the decision makers can go either way, without interference by the courts. "[A]n administrative decision is not subject to reversal merely because substantial evidence would have supported an opposite decision." Id.; Clarke v. Bowen, 843 F.2d 271, 272-73 (8th Cir. 1988).

## III. BURDEN OF PROOF AND SEQUENTIAL EVALUATION PROCESS

An individual claiming disability benefits has the burden of proving he is unable to return to past relevant work by reason of a medically-determinable physical or mental impairment

2

which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 423(d)(1)(A). If the plaintiff establishes that he is unable to return to past relevant work because of the disability, the burden of persuasion shifts to the Commissioner to establish that there is some other type of substantial gainful activity in the national economy that the plaintiff can perform. Griffon v. Bowen, 856 F.2d 1150, 1153-54 (8th Cir. 1988); McMillian v. Schweiker, 697 F.2d 215, 220-21 (8th Cir. 1983).

The Social Security Administration has promulgated detailed regulations setting out a sequential evaluation process to determine whether a claimant is disabled. These regulations are codified at 20 C.F.R. §§ 404.1501, et seq. The five-step sequential evaluation process used by the Commissioner is outlined in 20 C.F.R. § 404.1520 and is summarized as follows:

1. Is the claimant performing substantial gainful activity?

   Yes = not disabled.
   No = go to next step.

2. Does the claimant have a severe impairment or a combination of impairments which significantly limits his ability to do basic work activities?

   No = not disabled.
   Yes = go to next step.

3. Does the impairment meet or equal a listed impairment in Appendix 1?

   Yes = disabled.
   No = go to next step.

4. Does the impairment prevent the claimant from doing past relevant work?

   No = not disabled.
   Yes =   go to next step where burden shifts to Commissioner.

5. Does the impairment prevent the claimant from doing any other work?

   Yes = disabled.
   No = not disabled.

3

## IV.  THE RECORD

The record consists of the testimony of Plaintiff, vocational expert Cindy Younger, and the documentary evidence admitted at the hearing.

### A.  ADMINISTRATIVE REPORTS

**1.  Function Report – June 16, 2010**

Plaintiff indicated he could do most normal activities, although he experienced pain in his neck, shoulders and arms (Tr. at 153).  He is no longer able to mow the yard or play golf (Tr. at 153). Plaintiff vacuums the living room on a weekly basis (Tr. at 155). He indicated his conditions affected his ability to lift or reach; he did not indicate walking or standing were implicated (Tr. at 158).  When asked how far he could walk before needing a break, Plaintiff responded "I guess as far as I like" (Tr. at 158).  He indicated, "If I am able to find an employer who will hire me with my limitations and the use of pain meds, I will work."  (Tr. at 160).

### B.  SUMMARY OF MEDICAL RECORDS

On December 5, 2007, Plaintiff first reported to Dr. Ipsen for back and leg pain with associated numbness and tingling. Dr. Ipsen noted that imaging studies revealed degenerative disc disease at L5-S1, mild degenerative changes at L4-5, and neuroforaminal disc herniation at L4-5 on the right which was causing significant nerve root compression on the right in the foramen (Tr. at 297).  Dr. Ipsen diagnosed Plaintiff as suffering from: right leg radiculopathy; right L4-5 foraminal disk herniation; lumbar foraminal stenosis; and multilevel lumbar degenerative disc disease.  Plaintiff received L4-5 TLIF and posterior spinal fusion surgery to treat these conditions (Tr. at 297).

On October 30, 2009, Plaintiff returned to Dr. Ipsen complaining of neck and bilateral shoulder pain with associated numbness and tingling in his hands. Dr. Ipsen diagnosed Plaintiff

4

with C5-C6, C6-C7 degenerative disc disease and cervical radiculopathy (Tr. at 262).

On January 8, 2010, Plaintiff reported progressively worse pain and a review of his MRI revealed disc protrusions and multilevel stenosis at C4-C5, C5-C6, C6-C7 and very mildly at C3-C4 (Tr. at 259).

On February 25, 2010, Plaintiff had C4-C7 anterior cervical discectomy and fusion with allograft and plate instrumentation surgery (Tr. at 293-295).

On February 12, 2010, Plaintiff saw Dr. Ipsen (Tr. at 257). He stated he was doing better overall (Tr. at 257). Plaintiff was started on physical therapy (Tr. at 257).

On April 14, 2010, Plaintiff was seen six weeks post surgery (Tr. at 255). He stated he was doing okay, but continued to have pain in his left arm. He reported having been very active, including mowing the lawn (Tr. at 255). Dr. Ipsen instructed Plaintiff to return in four weeks to assess if he was ready to return to work (Tr. at 255).

On May 12, 2010, Plaintiff presented to Dr. Ipsen with complaints of continued right shoulder and neck pain post surgery (Tr.at 252). Physical examination revealed normal gait, limited range of motion in the cervical spine, and full muscle strength (Tr. at 252).

A May 18, 2010, CT cervical myelogram revealed congenital stenosis of the cervical spinal canal and stenosis of the neural foramen on the left at C5-C6 (Tr. at 305, 350).

On May 26, 2010, Plaintiff saw Dr. Ipsen for review of his CT myelogram (Tr. 240). His fusion appeared to be progressing nicely (Tr. at 240). Plaintiff's pain was diminished, although he still had some at the site of the operative intervention (Tr. at 240).

On May 27, 2010, Plaintiff was examined by Dr. John Knudsen, who felt that Plaintiff suffered from cervical radiculopathy and recommended treatment by way of epidural steroid injection (Tr. at 329).

5

On July 1, 2010, Dr. Ipsen noted that Plaintiff still had "persistent stenosis at multiple levels and a cervical spine with persistent radiculopathy." In addition, treatment by epidural steroid injections had brought no relief and Plaintiff reported remaining in significant pain. Dr. Ipsen diagnosed Plaintiff as suffering from multilevel cervical spondylosis and stenosis, cervical radiculopathy, and delayed cervical union and recommended C4 to C7 posterior cervical fusion with instrumentation in bilateral cervical laminal foraminotomies at every level (Tr. at 247).

Plaintiff underwent physical therapy from March 18, 2010 through June 10, 2010 (Tr. at 410-4). He reported on May 6, 2010 that he had been walking one and a half miles a day (Tr. at 419-435).

On July 15, 2010, Plaintiff underwent bilateral laminal foraminotomies at C4-C7, posterior spinal fusion at C4-C7and C4-C7 posterior segmental screw and lateral mass instrumentation (Tr. at 291-292, 343-344).

On September 1, 2010, Plaintiff saw Dr. Ipsen six weeks post surgery (Tr. at 321). He reported constant pain in his right arm that required pain medication (Tr. at 321). Physical examination revealed very little range of motion in his cervical spine (Tr. at 321).

Patient underwent physical therapy from September 8, 2010 through October 1, 2010, and responded favorably to treatment (Tr. at 389-394).

On October 13, 2010, Plaintiff returned to Dr. Ipsen three months after his C4-7 posterior spinal fusion. He reported moderate pain in his neck, shoulder and arm (Tr. at 322, 325). Pain prevented him from lifting heavy weights, but he could manage light to medium weights if they were conveniently positioned (Tr. at 322). Plaintiff indicated he could do most of his usual work, drive a car as long as he wanted, and engage in all his recreational activities (Tr. at 323). Physical examination of the arms was basically unremarkable with no significant findings noted (Tr. at

6

325). Gait was normal (Tr. at 325).

A October 22, 2010, CT of the cervical spine showed degenerative osteoarthritis anteriorly at C1-C2, degenerative cysts with minimal encroachment of the left exiting nerve root at C3, stable lumbar fusion and minimal cervical spondylosis at C7-T1 (Tr. at 318-319, 387-388).

On November 22, 2010, Plaintiff had the screw in his cervical spine at C4 removed (Tr. at 336).

On December 7, 2010, Plaintiff saw Dr. Ipsen with complaints of neck pain, although the symptoms had improved since his last visit (Tr. at 367). Physical examination revealed no tenderness to palpation in the cervical spine; range of motion of the cervical spine was decreased; no remarkable findings were noted with regard to Plaintiff's arms, shoulders, elbows and wrists (Tr. at 367). Plaintiff was prescribed SOMA Tabs and Vicodin (Tr. at 368).

On January 4, 2011, Plaintiff saw Dr. Ipsen with complaints of neck pain, although the symptoms had improved since his last visit (Tr. at 365). Physical examination revealed no tenderness to palpation in the cervical spine; range of motion of the cervical spine was decreased; no remarkable findings were noted with regard to Plaintiff's arms, shoulders, elbows and wrists (Tr. at 365). Plaintiff was prescribed Soma Tabs and Norco (Tr. at 366).

A January 7, 2011, CST of the cervical spine revealed a stable fusion at C4-C7 (Tr. at 334).

On February 15, 2011, Plaintiff continued to complain to Dr. Ipsen of pain down his neck and into his right arm. Physical examination revealed no tenderness to palpation in the cervical spine; range of motion of the cervical spine was decreased; no remarkable findings were noted with regard to Plaintiff's arms, shoulders, elbows and wrists. Dr. Ipsen prescribed narcotic pain medication and muscle relaxers to treat Plaintiff's pain, namely, Norco 5/325 and Soma Tabs (Tr. at 363-364).

7

On April 6, 2011, Plaintiff saw Sadie Holland, D.O., with complaints of neck pain (Tr. at 383). Physical examination revealed reduced range of motion of the cervical spine with rotation, side bending and extension (Tr. at 384). Plaintiff was referred to physical therapy (Tr. at 385).

Plaintiff underwent physical therapy on April 26, 2011 (Tr. at 379). He complained of pain in his right arm that radiated into his hand (Tr. at 379).

Plaintiff underwent physical therapy on May 12, 2011 (Tr. at 377). Improved mobility was noted (Tr. at 377).

On May 13, 2011, Plaintiff saw psychiatrist John Wade (Tr. at 361). He noted Plaintiff had been looking for work (Tr. at 361).

Plaintiff underwent an examination for commercial driving fitness on May 16, 2011 (Tr. at 375-376). He stated he was limited to lifting 35 pounds (Tr. at 375).

On September 14, 2011, Plaintiff saw Dr. Ipsen with complaints of low back pain (Tr. at 524-525). Physical examination revealed tenderness to palpation in the posterior lumbar spine (Tr. at 524). Range of motion was decreased (Tr. at 525). Straight leg raises were negative (Tr. at 525). Gait was normal (Tr. at 525).

A September 15, 2011, MRI revealed a wedging of the L1 vertebra which was probably physiologic, disc bulging and facet disease at L1-L2, mild central and left neural foraminal narrowing at L3-4, and degeneration at L5-S1 with disc bulging and facet disease (Tr. at 522-523).

On September 28, 2011, Plaintiff saw Dr. Ipsen for low back pain (Tr. at 526-527). Physical examination of the lumbosacral spine was unremarkable (Tr. at 526). Muscle spasms were absent (Tr. at 526). Examination of the legs and hips was unremarkable (Tr. at 526). Straight leg raises were negative (Tr. at 527). Dr. Ipsen noted Plaintiff would return within one week to evaluate if Plaintiff could return to work (Tr. at 527).

On October 3, 2011, Plaintiff was again examined by Dr. Knudsen for low back pain. Plaintiff complained of low back pain going down his right leg to his ankle since falling earlier in the month. He indicated standing, walking and lifting made the pain worse (Tr. at 471). He noted the pain kept him from working as a truck driver as he could not sit for long enough periods (Tr. at 471). Dr. Knudsen diagnosed lumbar radiculopathy and recommended epidural steroid injections (Tr. at 471).

Post-hearing on April 16, 2012, Plaintiff was sent to Dr. Christopher Andrew, M.D., for a consultative neurological examination. Dr. Andrew found that Plaintiff haD a history of chronic neck and back pain associated with degenerative disease and multiple surgeries. Dr. Andrew noted that Plaintiff's symptoms had not resolved despite conservative treatment, surgeries, injection therapy and physical therapy (Tr. at 510). Range of motion in the shoulders, elbows, wrists, hips, cervical spine and lumbar spine were within normal range (Tr. at 513-514). Straight leg raises were negative (Tr. at 514). Gait was normal (Tr. at 510). In assigning a residual functional capacity to Plaintiff, Dr. Andrew opined, that Plaintiff could frequently lift/carry up to 10 pounds, occasionally lift/carry 11-20 pounds, sit for 4 hours at a time for 8 hours of an 8-hour workday, stand and walk for two hours for 30-minute increments in an 8-hour workday (Tr. at 515-516). He could occasionally reach overhead, frequently reach (generally) and push/pull, and continuously handle, finger and feel (Tr. at 517). Plaintiff could frequently operate foot controls; occasionally climb stairs, ramps, ladders or scaffolds; stoop; kneel; crouch and crawl (Tr. at 517-518).

### C.   SUMMARY OF TESTIMONY

Plaintiff testified during the February 27, 2012, hearing. Vocational expert Cindy Younger also testified at the request of the ALJ.

1. **Plaintiff's Testimony**

Plaintiff testified that he was 50 years old on the day of the hearing (Tr. at 35). He has Associate's of Science degree in business management (Tr. at 36). He last worked for pay from May 18, 2011 through September 1, 2011, as a truck driver (Tr. at 37).

Plaintiff testified that he suffers from pain in his neck, right arm and lower back that radiates down into his right leg. Plaintiff stated that the pain from these conditions prevent him from working (Tr. at 38-39, 46, 47). Due to pain, Plaintiff can only sit for fifteen to twenty minutes at a time, stand for twenty to thirty minutes at a time and walk for fifteen to thirty minutes at a time (Tr. at 48-49). Plaintiff further stated that he is limited lifting only twenty pounds (Tr. at 39-40, 42). He reclines four to five times per day for fifteen minutes at a time to help with the pain (Tr. at 50- 51). Plaintiff also has difficulty with concentration (Tr. at 51-52). He spends his day trying to stay active, working on the computer and helping around the house (Tr. at 51).

2. **Testimony of Vocational Expert**

The ALJ first ask the vocational expert to assume an individual with the same age, education and work background as Plaintiff who could lift and carry up to twenty pounds occasionally, ten pounds frequently, can stand or walk a total of six hours and sit for six hours out of an eight hour work day, could occasionally stoop, crouch, kneel, crawl and climb but not ladders ropes or scaffolding, could perform only occasional overhead reaching, could perform work not involving the operation of vibrating tools or equipment, and could perform work not involving exposure to work place hazards, such as unprotected heights and dangerous moving machinery (Tr. at 54). In response to this hypothetical, the vocational expert stated that such an individual could not perform any of Plaintiff's past relevant work but could perform other work at the light exertional level such as a marker or tagger, injection mold machine tender, and storage facility

rental clerk (Tr. at 54-55).

The ALJ's second hypothetical asked the vocational expert to assume the hypothetical person described in his first hypothetical but who would be further limited to performing only simple, unskilled work (Tr. at 55). The vocational expert testified that the added limitation would not alter her answer given to the first hypothetical (Tr. at 55).

The ALJ's third hypothetical question asked the vocational expert to again assume the limits given in his first hypothetical with the added need to alternate between sitting and standing postures on approximately an hourly basis (Tr. at 55). The vocational expert again testified that again her answer to the first hypothetical would remain unchanged by the added condition (Tr. at 55).

The ALJ's final hypothetical asked the vocational expert to assume the limits given in his first hypothetical, but add the need to have one or two extra breaks of approximately 15 minutes during which time the person would need to recline (Tr. at 56). The vocational expert testified that such a limitation would preclude all unskilled work (Tr. at 56).

Lastly, the ALJ noted that it was not necessary to explore the sedentary job base with the vocational expert since, because there were no readily transferrable skills, it would just be a grid case (Tr. at 56).[1]

### D. FINDINGS OF THE ALJ

On June 7, 2012, the ALJ issued an opinion finding that Plaintiff was not disabled at step five of the sequential analysis. The ALJ found at step one that Plaintiff had not engaged in substantial gainful activity since his alleged onset date (Tr. at 14). At step two, the ALJ found

---

[1] I ascribe no ill intent or bias in the AJL's decision making process based on this statement. The ALJ is merely stating that testimony from a vocational expert would be legally unnecessary in such an instance.

11

Plaintiff had the following "severe" impairments: degenerative disc disease of the cervical spine, status post fusion surgery; history of lumbar spine degenerative disc disease, status post surgery; and vertigo (Tr. at 14-17). At step three, he found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled any listing (Tr. at 17). At step four, the ALJ found Plaintiff was unable to perform past relevant work (Tr. at 22). Finally, the ALJ found that there are jobs that exist in significant numbers in the national economy that Plaintiff could perform (Tr. at 22-23).

## V. RESIDUAL FUNCTIONAL CAPACITY

The ALJ found that Plaintiff retained the residual functional capacity to perform a range of "light work"; specifically:

> The claimant can lift and carry up to 20 pounds occasionally and 10 pounds frequently. He can stand or walk about 6 hours and sit for about 6 hours out of an 8-hour workday provided that he may alternate between sitting and standing postures on an hourly basis. He can occasionally stoop, crouch, kneel, crawl, and climb – but not ladders, ropes, or scaffolding. He can only occasionally reach overhead. He can perform work not involving operation of vibrating tools/equipment and not involving exposure to workplace hazards such as unprotected heights and dangerous moving machinery.

(Tr. at 17). Plaintiff argues that the ALJ erred in finding Plaintiff could stand and walk for six hours in an eight-hour workday and should have, instead, accepted Dr. Andrew's opinion that Plaintiff could only stand and walk for two hours in an eight-hour workday.

In discrediting this part of Dr. Andrew's opinion, the ALJ stated:

> . . . Dr. Andrew opined that the claimant could stand or walk for only two hours each, for only 30 minutes at a time. However, his examination did not indicate any functional problems or symptoms affecting standing or walking, except for reports of back pain. However, the claimant did not previously report problems with activities due to back pain, and he did not complain of problems working due to back pain. Moreover, there is no new imaging or other findings suggesting increased limitations since his prior back surgery. Therefore, even if the claimant has back pain, which is credible based on his prior surgery, there is no

12

evidence that suggests he cannot stand and walk a combined six hours per day given the opportunity for alternation. Therefore, the undersigned gives this one aspect of Dr. Andrew's opinion reduced weight.

(Tr. at 21).

"The ALJ may reject the conclusions of any medical expert, whether hired by the claimant or the government, if they are inconsistent with the record as a whole." Pearsall v. Massanari, 274 F.3d 1211, 1219 (8th Cir. 2001). Here, the ALJ correctly noted that Dr. Andrew's examination did not reveal anything that would affect Plaintiff's ability to stand and/or walk. Range of motion was normal, straight leg raises were negative and gait was normal (Tr. at 513-514). Similarly, none of Plaintiff's treating sources indicated such limitations. I note that the records do not contain any complaints associated with walking or standing other than Plaintiff's remark to Dr. Knudsen after falling; even yet, Plaintiff felt he was precluded from work only by sitting (Tr. at 471). Gait was consistently normal and straight leg raises were negative (Tr. at 252, 325, 510, 514, 525, 527). A September 28, 2011, examination of Plaintiff's lumbar spine was unremarkable (Tr. at 526). Plaintiff's own statements, likewise, support the ALJ's decision to afford Dr. Andrew's sitting/walking limitation less weight. Plaintiff told his physical therapist on May 6, 2010, that he had been walking one and a half miles a day (Tr. at 419). In a June 16, 2010, function report, Plaintiff did not indicate either walking or standing were implicated by his pain (Tr. at 158). In fact, he stated he was able to walk as far as he liked (Tr. at 158). The ALJ's decision to afford Dr. Andrew's sitting/walking limitation reduced weight is thus supported by substantial evidence.

## VI. CONCLUSION

As a result, it is

ORDERED that Plaintiff's motion for summary judgment is denied. It is further

13

ORDERED that the decision of the Commissioner is affirmed.


/s/ Robert E. Larsen
ROBERT E. LARSEN
United States Magistrate Judge

Kansas City, Missouri
March 20, 2015